UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA PUGH,

        Plaintiff,                                 Hon. Ellen S. Carmody

v.

                                                  Case No. 1:18-cv-78

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **vacated and the matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and*

*Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the

evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 51 years of age on her alleged disability onset date. (PageID.216, 239). She successfully completed high school and worked previously as a music teacher, receptionist, pharmacy technician, and teacher aide. (PageID.71-72). Plaintiff applied for benefits on April 25, 2014, alleging that she had been disabled since April 13, 2013, due to bi-polar disorder. (PageID.216-17, 239, 261). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (PageID.118-214).

On August 19, 2016, ALJ Michael Condon conducted a hearing with testimony being offered by Plaintiff and a vocational expert. (PageID.79-116). In a written decision dated September 28, 2016, the ALJ determined that Plaintiff was not disabled. (PageID.58-73). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.33-38). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## **ANALYSIS OF THE ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of

make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) bi-polar I disorder; (2) major depressive disorder; and (3) generalized anxiety disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of

---

Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4. If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.61-63). With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform a "full range of work at all exertional levels" subject to the following non-exertional limitations: (1) she is limited to performing simple, routine work that involves making only simple, work-related decisions and tolerating no more than occasional workplace changes; and (2) she is limited to working in a low-stress environment that involves doing jobs that have no fast pace or production rate quotas or requirements. (PageID.63).

The ALJ found that Plaintiff was unable to perform her past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 1.1 million jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (PageID.107-13). This represents a significant number of jobs. *See, e.g.,*

*Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant'"). Accordingly, the ALJ concluded that Plaintiff was not entitled to disability benefits.

**I.        Medical Evidence**

In addition to Plaintiff's statements and hearing testimony, the administrative record contained copies of Plaintiff's statements and treatment records. The ALJ described this evidence as follows:

> The record establishes the claimant's history of mental health treatment for symptoms of bipolar disorder, depression, and anxiety (See Ex. 8F/l; 10F). At the time of her alleged onset date in April 2013, the claimant separated from her husband (See, e.g., Ex. 3F/16; 4F/l; 12F/l). In May 2013, the claimant was taken to the emergency department after she began exhibiting severe mood instability and spending her mother's money in a reckless manner. At intake, it was observed that the claimant presented as depressed, anxious, and malodorous with an unkempt appearance, disorganized thought processes, delusional thought content regarding her mother, impaired insight, and impaired judgment. However, it was noted that she remained otherwise alert and oriented with fair eye contact, normal speech, and no suicidal ideation. The claimant was involuntarily psychiatrically hospitalized for approximately two-and-a-half weeks for further evaluation, treatment, and medication adjustments. During the course of this admission, it was reported that the claimant's symptoms gradually improved, but it was noted that the continued to exhibit limited insight. At discharge, Francine Friedman, M.D., diagnosed the claimant with bipolar I disorder. Dr. Friedman adjusted the claimant's medication regimen and advised her to follow up with outpatient treatment for ongoing medication management and individual therapy (Ex. 1F; see also Ex. 8F/l; 12F/l).
>
> In June 2013, the claimant attended a follow-up appointment with Michelle Taveras, Psy.D. At this appointment, the claimant denied any symptoms of depression or mania (Ex. 4F/l). Indeed, the record does not suggest that the claimant pursued any further direct mental health treatment until July 2013, when she was again taken to the

emergency department after her family expressed concern that she had continued exhibiting manic behaviors. Notably, the claimant acknowledged that she had also been consuming alcohol on a daily basis and using marijuana at this time. At intake, Raed Yousif, M.D., noted that the claimant demonstrated pressured speech, tangential thought processes, limited insight, and limited judgment. However, Dr. Yousif observed that the claimant was otherwise oriented and cooperative with good mood, good affect, good hygiene, good communication ability, good concentration, good memory, and no suicidal ideation. The claimant was psychiatrically hospitalized for approximately one month for further evaluation, treatment, and medication adjustments. After the claimant demonstrated persistent anger, irritability, and intrusiveness with staff during this admission, she was placed on lithium and Zyprexa. Following this adjustment, the claimant's "mood began to stabilize (and) she was much less intrusive." By discharge, it was noted that the claimant's "symptoms were improved, her mood was stabilized, she did have improved sleep, her concentration was much improved, her thoughts were clearer, (and) she was no longer delusional." Advanced practice registered nurse Leona Meengs assessed the claimant with bipolar disorder and instructed her to continue outpatient treatment for ongoing medication management and individual therapy (Ex. 3F; see also Ex. 8F/l).

In October 2013, the claimant attended a psychosocial evaluation with social worker Kristen Bylsma. Ms. Bylsma observed that the claimant demonstrated an apathetic mood, but noted that she was otherwise oriented, calm, and cooperative with appropriate affect, appropriate hygiene, appropriate thought processes, appropriate judgment, and no active suicidal ideation. Ms. Bylsma recommended that the claimant be approved for psychiatric medication management, individual therapy, and case management services (Ex. 4F/l l).

In January 2014, the claimant attended her first appointment with psychiatrist Michael Thebert, M.D. At this appointment, the claimant reported that she was "doing pretty good" and that her "mood seems to be stabilizing." However, the claimant also noted experiencing symptoms of fatigue. Dr. Thebert observed that the claimant presented as calm and friendly with euthymic affect, appropriate hygiene, good eye contact, and normal speech (Ex. 6F/1). That same month, the claimant told Dr. Taveras that she had "significant improvement in her depressive and anxiety symptoms." Notably, after Dr. Taveras informed the claimant that she would be leaving the clinic in March, the claimant "opted not to transfer to

another therapist due to her symptoms significantly improving" (Ex. 6F/35).

At an April 2014 medication management appointment, the claimant told psychiatric nurse practitioner Jenny Griffiths that her symptoms were under control while taking her medications as prescribed, explaining that "she is calm and making sense with her speech and is free of hypomanic behaviors." However, the claimant again noted experiencing symptoms of fatigue. Ms. Griffiths observed that the claimant demonstrated a dysphoric affect, but noted that she was otherwise alert, oriented, calm, cooperative, and friendly with appropriate behavior, appropriate hygiene, good eye contact, normal speech, logical thought processes, and no suicidal ideation (Ex. 6F/12). When the claimant presented to a Social Security Administration field office later that month, it was observed that she had no apparent difficulties concentrating, understanding, talking, or answering questions (Ex. 3E).

In May 2014, the claimant returned to Ms. Griffiths reporting that she was "alright (but) would like to be better." The claimant explained that her "mood feels stable, (but) a little on the depressed side." The claimant also expressed concern that she "wake(s) up exhausted and anxious at the same time." However, the claimant noted that her anxiety improved after taking Klonopin in the morning. Despite these reports, Ms. Griffiths again observed largely unremarkable mental status examination findings. Given the claimant's reported symptoms, Ms. Griffiths adjusted her medication regimen (Ex. 6F/23).

The claimant continued to attend intermittent case management appointments with Ms. Bylsma through July 2014 (Ex. 4F; 7F). In July 2014, psychiatrist Michael Michelakis, M.D., observed that the claimant presented as alert, oriented, engaged, calm, friendly, and well groomed with euthymic affect, good eye contact, normal speech, logical thought processes, intact memory, appropriate insight, and appropriate judgment. Dr. Michelakis diagnosed the claimant with bipolar I disorder in partial remission and adjusted her medication doses (Ex. 9F/l).

In October 2014, the claimant attended a psychological consultative examination with limited licensed psychologist Neil Reilly, M.A. At this evaluation, the claimant reported that her mood was stable with her medications, but she noted experiencing episodes of anxiety and sadness with crying spells and withdrawn behavior. The claimant also reported symptoms of morning grogginess, which she

suggested might be related to her medication. Mr. Reilly noted that the claimant presented as anxious at first with shaking and twitching of her hands and feet, and that she reported reduced motor behavior and low self-esteem. However, Mr. Reilly observed that the claimant remained otherwise oriented, cooperative, and calm with appropriate manners, appropriate hygiene, clear speech, logical thought processes, intact concentration, intact memory, and adequate insight. Ultimately, Mr. Reilly assessed the claimant with bipolar disorder and depression, which he concluded was "relatively stable." Notably, James Lozer, Ed.D., co-signed Mr. Reilly's report (Ex. 8F).

Later that month, the claimant returned to Dr. Michelakis reporting that she "feel(s) pretty good overall." The claimant explained that "her mood is good (with) decreased depressive symptoms." The claimant also noted that she was sleeping well and eating well with "quite mild" anxiety and no hallucinations, paranoia, or manic symptoms. However, the claimant stated that was experiencing decreased energy, forgetfulness, loneliness, and tremors in her extremities. Once again, Dr. Michelakis observed entirely unremarkable mental status examination findings. Dr. Michelakis concluded that the claimant only had mild depressive and anxiety symptoms, but recommended checking her lithium level to address her reported physical symptoms (Ex. 9F/10).

In January 2015, the claimant presented to physician assistant Vincent Hogan reporting that her bipolar disorder was "controlled (and) stable on medications." Indeed, Mr. Hogan observed that the claimant was oriented with appropriate mood, appropriate affect, normal memory, normal insight, and normal judgment (Ex. 15F/52). Two months later, the claimant presented to Karen Thornburg, M.D., reporting symptoms of depression, insomnia, and intermittent hand tremors. Notably, the claimant also reported that she had adjusted her lithium dose and stopped taking clonazepam on her own without consulting her psychiatrist (Ex. 15F/47). In May 2015, the claimant returned to Dr. Thornburg after being discharged from treatment with Dr. Michelakis. At this appointment, the claimant reported experiencing persistent insomnia and tremor. Dr. Thornburg assessed the claimant with bipolar disorder and provided her with a referral to a new psychiatrist (Ex. 15F/43).

In June 2015, the claimant attended her first appointment with new primary care provider Diana Dillman, D.O. Dr. Dillman noted that the claimant was a "difficult historian as (she) jumps (from) subject to subject," but she observed that the claimant remained otherwise

alert and oriented (Ex. 15F/6). In September 2015, the claimant attended her first appointment with new treating psychiatrist Thomas Kuhn, M.D. At this appointment, the claimant related her history of bipolar disorder and episodes of mania, but she added that her "symptoms have been relatively well controlled on her current medications." The claimant also noted that her tremors had decreased, but her anxiety had increased, after reducing her lithium dose two months earlier. Dr. Kuhn observed that the claimant demonstrated depressed mood, restricted affect, and quiet speech, but he stressed that she remained cooperative with normal psychomotor activity, goal- directed thought processes, fair-to-good insight, fair-to-good judgment, and no suicidal ideation. Dr. Kuhn diagnosed the claimant with bipolar I disorder and generalized anxiety disorder, and he increased her lithium dose (Ex. 12F/l).

At a January 2016 follow-up appointment with Dr. Kuhn, the claimant rated her depression as a one on a scale from one to ten even though "she has been taking her medications irregularly." Dr. Kuhn observed that the claimant exhibited an uneasy mood and a restricted affect, but he again noted otherwise normal mental status examination findings. Dr. Kuhn advised the claimant to continue taking her current medications as prescribed (Ex. 12F/5). In February 2016, the claimant began attending counseling with social worker Bethany Bertapelle (Ex. 11F). Two months later, the claimant returned to Dr. Kuhn, where she once again rated her depression as a one on a scale from one to ten while acknowledging that "she is still not taking medication regularly." Dr. Kuhn again observed largely unremarkable mental status examination findings, but he reduced her lithium dose to assist her with maintaining compliance (Ex. 12F/7).

By July 2016, the claimant rated her current symptoms of both depression and anxiety as a zero on a scale from one to ten. Dr. Kuhn noted that the claimant demonstrated uneasy mood and restricted affect with quiet speech, but he observed that she remained cooperative with normal psychomotor activity, goal-directed thought processes, fair-to-good insight, fair-to-good judgment, and no suicidal ideation. Given the claimant's minimal reported symptomatology, Dr. Kuhn refilled the claimant's medications and advised her to continue taking them as prescribed. Indeed, Dr. Kuhn added that the claimant "may consider reduction of Effexor or Klonopin in the future" (Ex. 13F).

At her August 2016 hearing, the claimant testified that she was continuing to attend regular appointments with Dr. Kuhn and Ms.

> Bertapelle, and that she was also attending support groups at the YMCA. The claimant also confirmed that her psychotropic medications had been effective in improving her mental health symptoms, as she had less depression, improved concentration, and her mania had leveled off. The claimant has reported taking Effexor, Lamictal, lithium, and Klonopin to treat her mental health symptoms (See also Ex. 11E). The claimant testified that these medications cause side effects of dehydration and tremors.

(PageID.64-67).

## II. Listing of Impairments

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled. Plaintiff argues that she is entitled to relief on the ground that the ALJ's decision that she does not satisfy section 12.04 of the Listings is not supported by substantial evidence.

Plaintiff bears the burden to demonstrate that she satisfies the requirements of a listed impairment. *See Kirby v. Comm'r of Soc. Sec.*, 2002 WL 1315617 at *1 (6th Cir., June 14, 2002). An impairment satisfies a listing, however, "only when it manifests the specific findings described in all of the medical criteria for that particular impairment." *Lambert v. Commissioner of Social Security*, 2013 WL 5375298 at *8 (W.D. Mich., Sept. 25, 2013) (citing 20 C.F.R. §§ 404.1525(d) and 416.925(d)). Section 12.04 of the Listing provides as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

    a. Anhedonia or pervasive loss of interest in almost all activities; or

    b. Appetite disturbance with change in weight; or

    c. Sleep disturbance; or

    d. Psychomotor agitation or retardation; or

    e. Decreased energy; or

    f. Feelings of guilt or worthlessness; or

    g. Difficulty concentrating or thinking; or

    h. Thoughts of suicide; or

    i. Hallucinations, delusions or paranoid thinking;

OR

2. Manic syndrome characterized by at least three of the following:

    a. Hyperactivity; or

    b. Pressure of speech; or

    c. Flight of ideas; or

    d. Inflated self-esteem; or

    e. Decreased need for sleep; or

    f. Easy distractibility; or

    g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

    h. Hallucinations, delusions or paranoid thinking;

OR

    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.04 (2016).

Plaintiff argues that she satisfies sections A and B above. The ALJ implicitly concluded that Plaintiff satisfied section A of this Listing, but expressly concluded that Plaintiff

did not satisfy section B. (PageID.62-63). Specifically, the ALJ concluded that Plaintiff experienced: (1) mild limitations in activities of daily living; (2) mild difficulties in social functioning; (3) moderate difficulties in concentration, persistence, and pace; and (4) one episode of decompensation. (PageID.62-63). While Plaintiff's argument that she has experienced repeated episodes of decompensation has some merit, given the current record, Plaintiff cannot satisfy her burden to demonstrate that she experiences "marked" limitations in any of the other three domains of functioning. Accordingly, this argument is rejected.

**III.        Treating Physician Doctrine**

On July 26, 2016, Dr. Kuhn completed a report concerning Plaintiff's ability to perform mental work-related activities. (PageID.547-48). As detailed below, the doctor concluded that Plaintiff was impaired to an extent greater than the ALJ recognized. The ALJ, however, afforded "little weight" to Dr. Kuhn's opinions. (PageID.69-70). Plaintiff argues that she is entitled to relief because the ALJ failed to articulate good reasons for affording less than controlling weight to the opinions expressed by her treating physician. The Court agrees.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

With respect to Plaintiff's ability to function in the workplace, Dr. Kuhn stated the following:

> [Plaintiff] has reached a level of function that is reasonably sustainable, working about 20 hours per week. Her medications

>provide good control of her symptoms, as long as she does not overextend herself. If she were to attempt a return to full-time work, I would expect her symptoms to increase dramatically. . .When [Plaintiff] comes in we talk about her medications [and] about her level of functioning. We have relatively extensive discussions about her work activity [and] her [activities of daily living]. She is functioning at her maximum. I would not recommend that she increase either the number of hours that she works or her "extra curricular" activities.

(PageID.547-48).

The doctor concluded, therefore, that if Plaintiff were working full-time she would experience serious limitation in her ability to deal with work stress and perform at a consistent pace. (PageID.547-48). The doctor further concluded that if Plaintiff were working full-time she would be "unable to meet competitive standards" in the areas of maintaining regular attendance and completing a normal workday and workweek without interruption from psychologically-based symptoms. (PageID.547).

In support of his decision to discount Dr. Kuhn's opinions, the ALJ stated, in relevant part:

>The undersigned gives little weight to Dr. Kuhn's opinion because it is inconsistent with the medical evidence and the record as a whole, including the claimant's history of treatment, the claimant's improvement with consistent medication usage, the mental status examination findings of other providers, and the claimant's reported activities of daily living. Dr. Kuhn's opinion is also inconsistent with his own treatment notes, which suggest the claimant's symptoms were relatively stable and well controlled with medication usage, and which reflect generally unremarkable mental status examination findings. As such, it appears that Dr. Kuhn may have relied quite heavily on the claimant's subjective report of symptoms and limitations, and that he may have uncritically accepted as true most, if not all, of what the claimant reported in formulating this opinion.

(PageID.69-70).

The ALJ's opinion is deficient in several regards. First, the ALJ stated that Dr. Kuhn's opinion is "inconsistent with the medical evidence and the record as a whole," but failed to identify what portion(s) of the record supported this conclusion. This failure prevents the Court from undertaking the sort of "meaningful review" the law requires. The ALJ also indicated that Dr. Kuhn's opinion was inconsistent with Plaintiff's reported activities. Statements by Plaintiff and her boyfriend on this topic, however, are entirely consistent with the doctor's opinion that Plaintiff can function reasonably well for limited periods of time. (PageID.268-75, 281-88). The ALJ also cited to various portions of Plaintiff's treatment records, but the evidence cited by the ALJ is, again, entirely consistent with Dr. Kuhn's opinion. (PageID.324, 382, 393, 402, 404, 434, 444, 453, 477-78, 492, 535, 540, 545). Finally, as for Dr. Kuhn's treatment notes, such are likewise consistent with his opinion that Plaintiff can function reasonably well for limited periods of time. (PageID.536-46).

The Court is not suggesting that Dr. Kuhn's opinion is the only one which the record supports or that a legally supportable argument cannot be made that the doctor's opinion should be discounted. The fundamental problem here is that the ALJ failed to sufficiently articulate *how* or *why* the doctor's opinion should be discounted. As previously noted, however, vague conclusions as to why a treating source's opinion was discounted are insufficient. *See, e.g., Friend v. Commissioner of Social Security*, 375 Fed. Appx. 543, 552 (6th Cir., Apr. 28, 2010) ("it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick"). Accordingly, the Court finds that the ALJ has failed to articulate good reasons, supported by substantial evidence, to support

his decision to discount Dr. Kuhn's opinion. Given that Dr. Kuhn's opinion is inconsistent with the ALJ's RFC determination and the ALJ's subsequent conclusion that there exist a significant number of jobs which Plaintiff can perform despite her limitations, the ALJ's failure is not harmless.

**IV.      Remand is Appropriate**

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if "all essential factual issues have been resolved" and "the record adequately establishes [her] entitlement to benefits." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994); *see also*, *Brooks v. Commissioner of Social Security*, 531 Fed. Appx. 636, 644 (6th Cir., Aug. 6, 2013). This latter requirement is satisfied "where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176; *see also*, *Brooks*, 531 Fed. Appx. at 644. Evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither competent nor authorized to undertake in the first instance. Moreover, there does not exist compelling evidence that Plaintiff is disabled. Accordingly, this matter must be remanded for further administrative action.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **vacated and the matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.

Dated: March 25, 2019                                           /s/ Ellen S. Carmody
                                                                                           ELLEN S. CARMODY
                                                                                           U.S. Magistrate Judge